[Civ. No. 1781.    Third Appellate District.—March 15, 1918.]

SAMUEL C. HAIGHT, Executor, etc., et al., Appellants,
v. W. H. STEWART et al., Respondents.

JUDGMENT—SCOPE OF PLEADINGS.—A party is not only entitled to any
and all relief which is appropriately within the scope of his pleading,
but may be awarded such relief upon any substantial legal or
equitable ground coming within the fair and reasonable import of
the averments of his pleading.

ID.—RESCISSION OF CONTRACT—EXCHANGE OF REAL PROPERTIES—FAIL-
URE OF CONSIDERATION—JUDGMENT WITHIN PLEADINGS.—In an
action to rescind a contract for the exchange of a tract of land for
the interest of the other exchanging party in certain other lands
and for corporation bonds, where the complaint alleged that de-
fendant had no title to the lands and that the bonds were worthless,
a judgment based upon failure of consideration could properly be
rendered within the pleadings, if supported by the evidence, not-
withstanding allegations of fraudulent representations and weakened
mental capacity of the plaintiff.

ID.—INADEQUACY OF CONSIDERATION—CANCELLATION OF CONTRACT.—
Where parties to a contract for an exchange of real properties have
full and equal opportunity for an independent and thorough inves-
tigation of the facts, and each exercises and relies upon his own
independent judgment in negotiating and consummating the transac-
tion, mere inadequacy of consideration, where it is not so gross as
to shock the conscience, is not of itself sufficient ground for cancel-
lation of the contract.

APPEAL from a judgment of the Superior Court of Glenn
County, and from an order denying a new trial. Wm. M.
Finch, Judge.

The facts are stated in the opinion of the court.

Leon Martin, and Keyes & Horne, for Appellants.

Duard F. Geis, for Respondents.

HART, J.—George W. Haight and his wife, Mary Setchel
Haight, commenced the action for the purpose of having
rescinded a certain contract between the plaintiff, George W.
Haight, and the defendant, W. H. Stewart, and to have de-
clared null and void two certain deeds of conveyance. After

the trial of the case, and before judgment was entered, · George W. Haight died and his executor, Samuel C. Haight, was substituted as one of the plaintiffs.

The complaint shows that during the month of November, 1911, George W. Haight and W. K. Stewart were negotiating for an exchange of certain properties. On the 22d of November, they entered into a written agreement by which said Haight agreed to convey to Stewart a tract of land situated in Glenn County, consisting of 760 acres, and Stewart agreed to convey to Haight his interest in certain lands in Mendocino County, subject to certain specified encumbrances, and also to deliver to him twenty-seven bonds of the par value of one thousand dollars each of the Western Consolidated Coal, Gas, and Electric Company (hereinafter called "the bonds"). The transaction was consummated on the twenty-seventh day of November, 1911, by the delivery to defendant, Myrtle J. Stewart, wife of W. H. Stewart, of a deed, executed by George W. Haight and his wife, conveying the Glenn County lands, and by the execution and delivery by said Stewart to George W. Haight of an assignment of all his right, title, and interest in and to the certificate of purchase of the Mendocino County lands, subject to certain encumbrances therein specified, and by the delivery to said Haight of twenty-seven bonds of said corporation.

On December 18, 1911, defendants, Myrtle J. Stewart and W. H. Stewart, conveyed the Glenn County lands to J. L. Stewart, the father of W. H. Stewart.

It is charged in the complaint that the above-described transaction was brought about by and through the false statements and representations of W. H. Stewart to George W. Haight; that said Stewart represented to said Haight that he had title to the Mendocino County lands, whereas, the title to said lands was never at any time vested in Stewart, but that the same was, at the time of the transfer, and still is, in the United States government; that Stewart stated and represented to said Haight that the bonds were of the actual value of six hundred dollars each and that he (said Stewart) had a short time previously to the transaction involved herein sold some of said bonds at that price; that said bonds were then "and now" of no value whatever and are wholly worthless for any purpose. It is alleged that said Haight, believing, accepting, and relying

upon the false statements and representations so made to him by Stewart, on the twenty-second day of November, 1911, entered into and subscribed to the written agreement with said Stewart above mentioned, and on the twenty-seventh day of November, 1911, in pursuance of said agreement, conveyed and transferred his Glenn County lands to said Myrtle J. Stewart. It is alleged that the said Myrtle J. Stewart knew that the statements and representations made by W. H. Stewart to said Haight were false and untrue when they were so made. It is further alleged that the said Haight, at the time of the transaction, was sick, physically and mentally, and that his mental strength had been prior to the time of the said transaction, and was at said time, greatly weakened. The complaint states that the said Haight and his wife, Mary S. Haight, the other plaintiff herein, did not know or have any knowledge that the said statements and representations made by the said W. H. Stewart at the time above mentioned respecting the bonds and the Mendocino County lands were not true until the fourteenth day of March, 1912, when they learned that said statements and representations were wholly false and untrue and that the said bonds were absolutely worthless and that the title to the Mendocino lands was still in the United States government, and not in the said W. H. Stewart. It is alleged that due notice to both W. H. Stewart and Myrtle J. Stewart was thereafter given by said Haight that he rescinded the transfer of the Glenn County lands and that said Haight offered to restore to the Stewarts everything of value he had received from them under the agreement of November 22, 1911.

A demurrer to the complaint on general and special grounds was overruled, and the defendants thereupon answered, denying specifically the averments of the complaint and affirmatively stating facts disclosing the nature of the transaction and the circumstances under which it was brought about.

The court, briefly stated, found: 1. That, on November 22, 1911, George W. Haight was the owner and in the possession of 760 acres of land in Glenn County, having a market value of eleven thousand four hundred dollars; 2. That, on said date, W. H. Stewart was in possession of, and had an interest in, the Mendocino County lands described in the complaint under a certificate of purchase from the state of

California, numbered 15,955, which said interest was of the value of six thousand dollars, and subject to the following encumbrances: A certain mortgage thereon to one V. W. Liston, amounting to $350; a certain trust deed thereon to one H. S. Bridge in the sum of $450; delinquent taxes amounting to $250; the balance of the purchase price due to the state of California on said lands, amounting to the sum of $340; and the sum of one hundred dollars due to one H. S. Beadle, constituting a lien upon said premises; 3. That said Stewart, on the twenty-second day of November, 1911, was the owner and did own twenty-seven bonds of the Western Consolidated Coal, Gas, and Electric Company, having a nominal par value of one thousand dollars each; that said bonds had no cash market value, but that they did have a "speculative or trading value"; 4. That George W. Haight and wife conveyed the Glenn lands to Myrtle J. Stewart at the request of W. H. Stewart, and received in exchange therefor the twenty-seven bonds of the Western Consolidated . . . Company, and a conveyance of all W. H. Stewart's interest in and to the Mendocino lands; 5. That in the negotiations culminating in the agreement of November 22, 1911, W. H. Stewart told George W. Haight that said bonds were of the value of six hundred dollars each, and that he (Stewart) believed they were worth six hundred dollars each, but that said Stewart did not tell said Haight, as the complaint alleges, that the said bonds were of the reasonable market value of six hundred dollars each, and could actually be sold for said sum; and that said Stewart did not tell said Haight, as the complaint charges, that he (Stewart) was well acquainted with the value of the said bonds, and that he had, at a time immediately preceding said twenty-second day of November, 1911, actually sold said bonds for said sum of six hundred dollars each, and that said bonds were then actually being sold and could be sold for said sum; 6. That no fraud was practiced or perpetrated on Haight by Stewart, and that Haight was not induced or influenced to enter into and carry out the agreement of November 22, 1911, through any fraud or misrepresentation on the part of W. H. Stewart; 7. That, at the time the above contract was entered into, George W. Haight's health and mentality were weakened, but not to such an extent that he did not fully know and understand the details of the trans-

action referred to herein; that W. H. Stewart was aware of Haight's illness, but did not know that his mentality was impaired in any degree.

The appeal is by the plaintiffs from the judgment and the order denying a motion interposed by them for a new trial.

A reversal is demanded upon the ground that there is no evidence to support these findings: 1st. That the said bonds had a speculative or trading value; 2. That W. H. Stewart had an interest in the Mendocino County lands; 3. That W. H. Stewart was not guilty of fraud in the matter of the agreement of November 22, 1911.

The general position of the appellants is that, the said bonds and the said assignment of the interest of W. H. Stewart in the Mendocino lands being the only consideration the plaintiffs received for conveying and transferring the Glenn County lands to Myrtle J. Stewart, if it appears from the evidence that said bonds were wholly valueless and that W. H. Stewart had no interest in the Mendocino lands, then it must necessarily be held that the Haights conveyed away 760 acres of land, having a value of eleven thousand four hundred dollars, without receiving therefor any consideration whatever; that, in such a situation, a failure of consideration is shown for which there must be a rescission of the transfer of said lands. It is contended that the evidence does show the worthlessness of the bonds and that W. H. Stewart had no interest in the Mendocino lands, and, furthermore, that George W. Haight was in an enfeebled condition of health when the transfer and the agreement therefor were made, and that he was imposed upon and induced to enter into and consummate the transaction through the fraud of W. H. Stewart.

We may first notice the point made by the respondent that the complaint does not proceed upon the theory that there was a failure of consideration, and that such was not the theory upon which the case was tried in the court below; that the complaint is based solely upon the alleged fraud whereby the transaction was consummated, and that upon that ground alone a rescission was and is demanded; that, therefore, the position of appellants in this court that there was a failure of consideration is not warranted by their pleading or the essential theory thereof, and that, consequently, the elaborate argument in their briefs addressed to

that proposition is entirely gratuitous and without pertinency or force.

It is, of course, well settled in procedural law that a party is not only entitled to any and all relief which is appropriately within the scope of his pleading, but may be awarded such relief upon any substantial legal or equitable ground coming within the fair and reasonable import of the averments of his pleading. In this case, it is plainly manifest that the complaint, assuming its averments to be true, reveals a clear case of failure of consideration. The statements therein are that the bonds are absolutely valueless for any purpose and that W. H. Stewart had and has no interest in the Mendocino lands. These constituted the sole consideration for the transfer by Haight to Myrtle J. Stewart of the Glenn lands. If the bonds were worthless and Stewart had no interest in the Mendocino lands, then surely there was a failure of consideration. The allegations of fraud and of the enfeebled mental condition of Haight were proper for the purpose of showing that thus Haight was imposed upon and induced to transfer his property for nothing, or for a purported consideration which it developed was worthless or without any value. The fact is that the failure of consideration is the prominent, and, indeed, the principal, factor in the cause of action stated by the complaint.

We are persuaded, however, from an examination of the record that the challenged findings are sufficiently supported to fortify them against successful attack and that there was not a failure of consideration. We may with propriety first briefly consider the testimony relative to the mental condition of Haight for some time prior to and at the time of the making of the agreement of November 22, 1911, and the subsequent exchange of the properties above mentioned in pursuance of the provisions of said agreement.

George W. Haight was an attorney at law, having offices in the city of Berkeley, and had actively practiced his profession for many years. In late years, prior to his death, in connection with his law practice, he dealt extensively in real estate, buying, selling, and exchanging real properties. While two physicians who had professionally attended him on several occasions and who likewise investigated his condition some time before and at about the time of the transaction concerned herein testified that Haight, at said times,

was undergoing a decline in physical and mental strength, that he was suffering from what is known in medical science as bulbar paralysis, and that his tendency was also to a paretic condition, there was also testimony that, save a noticeable impairment of memory, he was capable of transacting business intelligently and with good judgment. His own son, the substituted plaintiff herein, testified that for a considerable period before and down to the time of the execution of the agreement of November, 1911, he was engaged in performing certain duties in his father's office and saw him daily, and that, while he observed that his father's memory was not as good as it had formerly been, he was, nevertheless, in full possession of his reasoning powers. The defendant, W. H. Stewart, testified that he had another and different real estate transaction with Haight just prior to the deal with which we are here concerned and that, at that time, as well as in all the negotiations leading to the transfer of the Glenn County lands by Haight to his (Stewart's) wife, he observed nothing either in Haight's actions or his method of transacting business indicating that he was in the slightest degree lacking in judgment or business sagacity.

In addition to the above testimony, it was shown that Haight himself prepared the agreement of November 22, 1911, and the instrument appears to have been drawn as a lawyer of skill would prepare such a document. It is in language which clearly and unambiguously expresses the propositions to which the parties had mutually agreed. There is also medical testimony tending to impeach the medical testimony presented by the plaintiffs upon the question of Haight's mental competency at the time of the making of the said agreement and also when subsequently he made the transfer of the Glenn lands to Myrtle J. Stewart.

As to the negotiations resulting in the making of the written agreement of November 22, 1911, and the subsequent exchange of properties between George W. Haight and W. H. Stewart, the latter testified: That he first met George W. Haight in April, 1911, with reference to a deal for some property in Boston, which was consummated in August or September; that, upon the closing of that transaction, Haight asked him if he had some other things he was willing to trade; that he (Stewart) said that he had an interest in a twenty per cent certificate of purchase representing some

lands in Mendocino County; Haight asked questions about
the location of the lands, the climate, etc., and said: "I want
to see if it is a good hunting lodge or summer home prop-
osition and at the same time a healthy investment for the
future." The witness proceeded: "Haight said, 'What else
have you got, Stewart?' I told him, 'I have some bonds of
the Western Consolidated Coal, Gas & Electric Co.,' and he
said, 'Why, I think I have got some of that kind, too,' and
he jumped up out of his chair and opened his safe and
brought out a bunch of bonds and he said, 'Are they like
this?' and I said, 'Yes, they are the same thing; do you know
anything about the bonds?' and he said, 'I have looked them
up and they represent leases and fee-simple lands and a con-
tract for between fifteen thousand and twenty thousand acres
of land,' and I asked him what he thought of them, and he
said, 'You can't cash them at the bank; I have tried to;
but the reason is the coal companies are fighting among
themselves and quarelling and raising money to transport
the coal; they have fine mines and I found they were good.'
I asked him where he got them and he said, 'From Mr.
Runnels in trade for West Berkeley property.' I asked him
what he allowed him for them and he said, 'I allowed him
full cash value, because I think they are good bonds, although,
of course, you will have to wait. What are you holding
these bonds at?' and I said, 'Judge, I don't know. I don't
know what they are worth. All I know is what they got
me. . . . Some of them cost me thirty cents on the dollar
and some twenty-five cents.' The judge jumped out of his
chair and said to me, 'These bonds must be valuable. Any-
thing that has any interest in coal mines on the Pacific Coast
can't help but be good things.'" The witness said that
Haight gave him a description of his Glenn County lands
and asked him if he had an abstract of title to the Mendo-
cino County lands. Stewart produced a certificate of search
and handed it to Mr. Haight, who looked it over and re-
marked, "This shows the property in the name of Marcus D.
Hyde." The witness said, "Yes, Mr. Hyde is holding it for
me." Haight said, "I will look it over. I am not satisfied
about the bonds but I will look them up, too." In about a
week or ten days Stewart returned to the office of Mr. Haight,
who said, "I have found out that the twenty per cent cer-
tificate of purchase is *prima facie* evidence of title, but, of

course, the title is not in you. You have no deed or patent, but you will have title in proper time; you will be patent owner of the land. I found that it is a negotiable title and that a man can buy or sell or borrow money and I am satisfied.'' Stewart asked, ''Did you look up the bonds any more?'' to which Haight replied, ''Yes, I looked the bonds up. . . . I am willing to take a chance and wait for them to quit fighting, and when they settle down and get a railroad in, the bonds will go up and if I can get them cheap enough, I will take them.'' There was a discussion of values of the different properties and of the timber and tanbark on the Mendocino County lands, and considerable figuring was done. The witness said he figured that there was timber on the land of the value of six thousand dollars and from four to six hundred cords of tanbark worth from four dollars to six dollars per cord, and that with the six thousand dollars' worth of timber ''that would make a total valuation of eight thousand four hundred dollars. We wrote that down,'' continued Stewart, and he (Haight) asked, ''How do you then figure the bonds?'' The witness replied, ''Judge, that is a question about the bonds. I don't know what they are worth. I am not positive on them. You know about them better than I do.'' Haight then said, ''I have 720 acres at Willows. If you will give me these twenty-seven bonds and your interest in the timber lands, subject to the encumbrances against them, I will give you that land up at Willows and you can see what you can do with it.'' Stewart, continuing, testified: ''We figured it right here. Judge Haight and I both figured it and the timber land figured out eight thousand four hundred dollars, less about one thousand five hundred dollars in debts against it—old encumbrances against it, and I said, 'Now, these bonds would average me between twenty-five and fifty cents on the dollar, because some cost me fifty cents and some twenty-five cents on the dollar,' and he said, 'That is as much as I would allow.' '' Stewart then said to Haight that he would think it over and see him later, and Haight said, ''All right, and I will think it over, too, and I will see if I can find out any more information about the bonds and maybe I will do better.'' About one week after said conversation, which was on November 22, 1911, Stewart returned to Haight's office and met the judge, who thereupon asked Stewart what he then thought of the pro-

posed deal. Stewart said, "In view of the fact that I had moved away from where I was, I would be willing to trade on the basis that he [Haight] proposed," and the latter replied, "Well, if you want to make the deal I will call in the stenographer and dictate a preliminary contract so we can tie each other up." The trading agreement was thereupon dictated to the stenographer by Haight, and, being written up, was signed by Stewart and Haight on November 22, 1911. Stewart again called at Haight's office and the papers transferring the respective properties were executed and exchanged. Among these instruments was an agreement between Stewart and Marcus D. Hyde in which the latter. agreed to quitclaim the Mendocino County lands to Stewart upon the payment of twenty dollars, which agreement Stewart assigned to Haight.

A timber cruiser and expert testified that he examined the Mendocino lands, either in January or February of the year 1911, and found thereon about five millions of feet of red fir timber, about one million feet of redwood, and about four hundred cords of tanbark; that prior to making said investigation he was not acquainted with and had never met W. H. Stewart, having made the examination of the lands at the request of one Borden; that, in November, 1911, he had business with George W. Haight in his office and was in the act of leaving the office when he met W. H. Stewart going into Haight's office; that Stewart requested the witness to return with him to the office of Haight and tell the latter what he knew of the lands; that he did so, drew a diagram of the land, and produced some photographs showing how much timber it contained, and told Haight of the quantity and quality of the timber on the land.

Samuel C. Haight testified that he knew very little of the details of the transactions between his father and W. H. Stewart, and that he had no conversation with his father regarding said transactions, except that his father "spoke of his enthusiastic desire to own a piece of timber land."

There is testimony by one witness that the one thousand dollar bonds were selling for five to ten dollars each and by another witness that they were worth from ten to twenty-five dollars each in November, 1911.

There is also some testimony tending to show that Judge Haight was very desirous of securing the Mendocino lands

because he believed they were suitable for a country home, which he appeared to be anxious to have located in the mountains, where there were opportunities for fishing and hunting.

Thus we have presented herein a statement in substance of the testimony upon which the trial court grounded the findings, and nothing more need be said of it than that it is amply sufficient to support the conclusions evidenced by said findings that George W. Haight, at the time of making the agreement and the transfer in question, while not in his usual good health, was nevertheless mentally capable of intelligently, understandingly, and properly conducting those transactions so as to safeguard his own interests, and that there were no false representations by Stewart as to the nature or extent or value of his interest in the Mendocino lands, nor misrepresentations or subreption upon his part as to the bonds in question or their value. As to the bonds, it is quite clear that the court was warranted in finding that Stewart did not represent to Haight that they were of the value of six hundred dollars each. Stewart not only denied making any such representation, but the proposition is unreasonable upon its face. It is hardly conceivable—at least it is not consistent with a reasonable view—that a sane man would have the temerity to represent or pretend that securities which, with a valuable equity in a tract of land, he was willing to exchange for a tract of land of the value of eleven thousand four hundred dollars, were actually worth, at the time of the proposed exchange, the sum of sixteen thousand four hundred dollars.

It is vigorously argued, however, that the bonds had no value whatever, and that the court's finding that they had a "speculative or trading value" is wholly meaningless. There is some evidence tending to show that the bonds had some value. Haight certainly believed that they had some value, and, according to the findings, based that belief upon his own personal knowledge of them. In discussing the bonds with Stewart, he, in effect, expressed the opinion founded upon what he knew of the corporation by which they were issued, that they would develop into valuable securities if the affairs of said corporation were properly managed in the future—that is, to be more specific, he said that they would become valuable if the corporation could secure or "take in"

a railroad to be used for its purposes. In brief, the general trend of his talk respecting the bonds was that he had some confidence that they would at some future time acquire substantial value. And it was doubtless upon this testimony and the testimony of other witnesses that in November, 1911, the one thousand dollar bonds were worth from five to ten dollars each, one witness stated, and from ten to twenty-five dollars each, another witness stated, that the court based the finding that, at the time of the deal between Stewart and Haight, they had a "speculative or trading value"—that is to say, as we understand that phrase, that they had a value following from a possibility or probability, dependent upon the future happening of certain contingencies respecting the affairs of the company issuing them, that they would in the future acquire a substantial cash market value.

It is contended, however, that Stewart, having no title to the Mendocino lands, the same still being in the United States government, he had no valuable or any interest therein which he could transfer. But, in the first place, it is to be remarked that Stewart testified and the certificate of search, which, as seen, was examined by Haight, showed, and upon this testimony the court found, that Stewart did not claim nor represent or state to Haight that he was vested with title to the lands, but stated that he had such interest therein only as was embraced within the scope of the certificate of purchase from the state of California. In the second place, it is to be observed that the lands, although the title thereto was still in the federal government, had been duly selected as lieu by the state, was open to sale by the state when Stewart received his certificate of purchase (Pol. Code, sec. 3513), and that said certificate was subject to sale by the owner or holder thereof by deed or assignment. (Pol. Code, secs. 3514, 3515.) Quite clearly, the cases cited by the appellants that no title to the public lands of the United States passes to the state or to purchasers from the state until the lands are certified over to the state by the commissioner of the general land office are not in point here, since there is, as seen, no claim that Stewart attempted to convey the title to the Mendocino lands to Haight, nor made any pretense of being able to do so or of doing so when negotiating and consummating the deal between him and Haight.

Thus we find an answer to the contention of the appellants that there was a total failure of consideration for the transfer of the Glenn lands by Haight to Myrtle J. Stewart. There was a consideration, and a valuable one, according to the finding of the trial court. It is true that there is a wide difference between the value of the Glenn lands, as found by the court, and that of Stewart's interest in the Mendocino lands, as likewise found. But it is not necessarily to be held to follow from that fact that there was a failure of consideration or that the consideration moving to the plaintiffs for the transfer of the Glenn lands was so inadequate as to "shock the conscience," and so justify a court of equity in setting aside the transfer as involving an inequitable and unconscionable transaction. The parties to this transaction each had full and an equal opportunity for an independent and thorough investigation of the facts of the proposed transfer, and each exercised and relied upon his own independent judgment in negotiating and consummating the transaction. They sustained no relation of confidence to each other and dealt with each other at arm's-length. It is clear that Judge Haight conducted his end of the transaction with his eyes wide open. He examined the certificate of search of the Mendocino lands, which plainly showed the nature of Stewart's interest therein and the encumbrances to which that interest was subject. He owned, and for a long time previously to the transfer had owned and had in his possession, bonds similar to those which he received in the deal from Stewart. He knew as well as did Stewart, if not better than the latter, what those bonds were and what they amounted to. Neither probably considered that they possessed much, if any, cash value then. As the learned trial judge said in deciding the case, both the "parties probably knew that efforts were being made to place the company on its feet. If these efforts were successful, the bonds would greatly increase in value. They were an inviting investment to one who was willing to take desperate chances of losing a small investment in the hope of repaying a profit of many hundred per cent."

Professor Pomeroy, in his work on Equity Jurisprudence, third edition, section 926, says: "Where the parties were both in a situation to form an independent judgment concerning the transaction, and acted knowingly and intention-

ally, mere inadequacy in the price . . . unaccompanied by
other inequitable incidents, is never of itself a sufficient
ground for canceling an executed or executory contract.''
(See, also, the late case of *Hallidie* v. *First Federal Trust
Co., etc.,* 177 Cal. 600, [171 Pac. 431].)

It is not always readily or easily determinable what is an
adequate consideration in a given case for the transfer of
property. Many and various elements may be necessary to
be considered in determining that question. While, in most
instances, the principal criterion is probably the market value
of the property or the value for the purposes to which it may
the most advantageously be put, yet it is often proper to
consider other special motives or purposes, if any there be,
of the parties in making and receiving the transfer. Sen-
timental or peculiar personal reasons, having no reference
either to the intrinsic or market value of the property, may
be the controlling motive of the sale and purchase. Hence,
''as Hobbes says,'' quoting from ''Ruling Case Law,'' volume
6, section 85, ''the value of all things contracted for is meas-
ured by the appetite of the contractors. Accordingly, the
courts do not ordinarily go into the question of equality or
inequality of considerations, but act upon the presumption
that parties capable to contract are capable of regulating the
terms of their contracts, granting relief only when the in-
equality is shown to have arisen from mistake, misrepresenta-
tion, or fraud. A different rule would, in every case, im-
pose upon the court the necessity of inquiring into and of
determining the value of the property received by the party
giving the promise. Such a course is deemed to be imprac-
ticable. In all cases, therefore, where the assumption or
undertaking is founded upon the sale or exchange of mer-
chandise or property, or upon other than a money consid-
eration, and the promise has been deliberately made, the law
looks no further than to see that the obligation rests upon a
consideration; that is, one recognized as legal, and of some
value. It is sufficient if it is of only slight value, or such
as can be of value to the promisor. Where a party contracts
for the performance of an act which will afford him pleas-
ure, gratify his ambition, please his fancy, or express his
appreciation of a service another has done him, his estimate
of value should be left undisturbed, unless, indeed, there is
evidence of fraud. There is, in such a case, absolutely no

rule by which the courts can be guided, if once they depart from the value fixed by the promisor. If they attempt to fix some standard, it must necessarily be an arbitrary one, and ascertained only by mere conjecture. If, in the class of cases mentioned, there is any legal consideration for a promise, it must be sufficient for the one made; for, if this is not so, the result is that the court substitutes its final judgment for that of the promisor, and, in doing this, makes a new contract.''

In this case, as shown, there is evidence that Judge Haight was anxious to secure a country home in the mountains and that he had an ''enthusiastic desire'' to own some timber land. His Glenn County lands, as the evidence shows, were what are commonly known as ''goose lands,'' and were so plentifully charged with alkali as to render them unfit for general agricultural purposes. It further appears that he was then and for some time prior had been renting them for two hundred dollars per year, a little more than enough to pay the taxes on them. It was probably his desire to get that unproductive and unprofitable tract off his hands and at the same time secure timber land and such a location for a country home as his heart longed for that largely influenced him to make the trade. At any rate, the evidence shows that he received a valuable consideration for his Glenn County lands and, being perfectly competent to transact business intelligently and understandingly, that he deliberately and intentionally, and in reliance upon his own independent judgment, entered into and consummated the transaction. He must, therefore, stand by the bargain of his own making.

The judgment and the order appealed from are affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 13, 1918.